**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

GLENN D. PAULEY,

        Plaintiff,

v.                          CIVIL ACTION NO. 2:09-cv-00896

HARTFORD LIFE AND ACCIDENT INSURANCE CO.,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the court are the parties' cross motions for summary judgment [Dockets 12, 16], and the plaintiff's motion to exceed page limit [Docket 14]. The plaintiff's motion to exceed page limit is **GRANTED**. For the following reasons, the cross-motions for summary judgment are **DENIED** and this matter is **REMANDED**.

**I.  Background**

*A.  Summary of the Case*

Plaintiff Glenn E. Pauley brings this action against defendant Hartford Life and Accident Insurance Co. ("Hartford"). Pauley alleges that Hartford wrongfully denied him long-term disability ("LTD") benefits after an impaired physical condition forced him to leave work. Pauley is a former employee of Bayer Corporate and Business Services LL ("Bayer"). He was a participant in a long-term disability plan titled "Bayer Corporate and Business Services, LL Group Disability Income Insurance Plan," (the "Plan") funded by an insurance policy insured by Hartford. Bayer serves as

the administrator of the Plan, but Hartford administers and pays claims, and makes determinations of eligibility.[1] (*See* A.R. 36.)[2]

The Plan provides for LTD benefits for an initial twenty-four month period to participants who are disabled under the following terms:

> *Disability* means that during the *Elimination Period* and the following [24] months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1) continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
> 2) not *Gainfully Employed*

(A.R. 20 (the "own occupation" provision).) The Plan provides for benefits after the twenty-four month period, however, only if the participant cannot perform "any occupation." (*Id.*) The Plan provides

> After the *LTD Monthly Benefit* has been payable for [24] months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1) continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
> 2) not *Gainfully Employed*.

(*Id*. (the "any occupation" provision).)[3]

After Pauley stopped working due to his physical condition, he applied for and received disability benefits from the Social Security Administration (the "SSA"), effective August 1, 2005.

---

[1]The Plan states that CNA Group Life Insurance Co. possesses these responsibilities, but CNA was subsequently acquired by Hartford. (Compl. ¶ 8.)

[2]Citations to "A.R." refer to the contents of the Administrative Record in this case.

[3]The Plan originally called for only twelve months of "own occupation" coverage, but an amendment to the Plan, effective October 1, 2002, changed this time to twenty-four months.

He also received disability benefits under the Plan for twenty-four months, from August 10, 2005, to August 10, 2007. After this time period, however, Hartford denied Pauley "any occupation" LTD benefits because it determined that Pauley could perform sedentary work. Pauley challenges this determination.

   *B.*  *Factual and Procedural Background*

Pauley worked as a Distribution Specialist for Bayer. His job duties included "product drumming facility loading, drumming 150 lb. drums onto pallets, . . . unloading and loading trucks for product distribution." (A.R. 183.) Pauley's physical condition began to deteriorate. He started to experience severe pain in his feet, ankles, knees, low back, shoulders, neck and hands. He worked until February 10, 2005. Pauley applied for LTD benefits under the Plan, and his application was granted because Hartford determined that Pauley could not perform his "own occupation." He therefore began receiving "own occupation" benefits effective August 10, 2005.

On August 10, 2007, however, Hartford terminated Pauley's benefits because he failed to establish that he was disabled from working in "any occupation." In reaching its decision, Hartford surveyed several pieces of evidence, which are set forth in the administrative record. The record includes reports from Dr. Jonathan Lilly, family physician; Dr. John B. White, podiatrist; Dr. Manuel Molina, orthopedist; Dr. Christopher Kim, pain management specialist; Dr. Michael Istfan, rheumatologist; Dr. David L. Soulsby, orthopedist; Dr. Sally Swisher, neurologist; and Dr. Mallinath Kayi, pulmonologist. These reports reveal that Pauley suffered from a range of health problems, including axonal polyneuropathy, sleep apnea, carpal tunnel syndrome, osteoarthritis, degenerative joint disease, and fibromyalgia. The doctors reported that Pauley complained of chronic severe pain, that MRI results showed degenerative changes in the spine, and that EMG results showed no sensory

response and "significant decrease in amplitude." (A.R. 545.) Hartford also contacted Pauley and spoke with him about his physical impairments. It also prepared an Assessment of Employability Report, which identified jobs that Pauley would be capable of performing, including production clerk, repair order clerk, and surveillance-system monitor.

On August 7, 2007, Hartford sent a letter to Pauley notifying him of denial of "any occupation" LTD benefits. The letter concluded,

> In summary, the medical and vocational information in your file supports that you are capable of performing alternative work. In view of these findings, we have determined that you are not prevented from performing Any Occupation for which you are or become qualified, as required by the policy definition of Disability that will become applicable on 08/10/07. As such, no further benefits are payable under the above referenced Long Term Disability policy on and after this date.

(*Id*. at 437.) The letter listed the following medical information considered in its determination:

- 1/15/04 - 10/13/04 – Medical Records – Dr. Loren Smith
- 6/28/05 - 5/10/06 – Medical Records – Dr. Manuel Molina
- 4/14/05 - 7/3/07 – Medical Records – Dr. Jonathan Lilly, FP
- 6/28/05, 7/12/05 – Functional Assessment Tool – Dr. Lilly
- 7/13/05 – Functional Assessment Tool – Dr. John White, podiatrist
- 7/23/04 - 7/13/05 – Medical Records – Dr. White
- 7/7/05 - 8/12/05 – Medical Records – Dr. Christopher K. Kim
- 8/12/05 – MRI – Dr. Kim
- 11/22/05 – Medical Statement – Dr. Michael Istfan, Rheumatology
- 12/9/05 – Attending Physicians Statement – Dr. Lilly
- 1/11/05 - 6/14/06 – Medical Records – Dr. David Soulsby
- 6/23/06 – Medical Statement – Dr. Lilly
- 5/29/07 – Medical Records – Dr. Mallinath Kayi, Pulmonologist
- 5/30/07 – Medical Records – Dr. Sally H. Swisher, Neurologist
- 6/4/07 – Medical Statement – Dr. Swisher

(*Id.* at 435-36.)

Pauley appealed the termination of his benefits on February 5, 2008, and submitted additional medical records and letters from Dr. Lilly and Dr. Swisher. The doctors represented that Pauley was "disabled from gainful employment" and "unable to work at the present time in any

physical capacity." (*See id.* at 480, 543.) Hartford referred Pauley's file to two board-certified specialists, Dr. Mark J. Borigini (internal medicine and rheumatology) and Dr. Leonid Topper (neurology), so that they could review Pauley's medical records, speak with his treating physicians, and prepare detailed reports. (*See id*. at 756-61.) Both physicians determined that Pauley could perform sedentary work. Hartford denied the appeal.

Pauley then filed this action on August 5, 2009, claiming that Hartford violated the provisions of the Employees Retirement Income Security Act ("ERISA"), specifically 29 U.S.C. § 502(a). He asserts that "the defendant misconstrued evidence and did not base its decision on substantial evidence." (Pl.'s Mem. Supp. Mot. Summ. J. 14.)

At the heart of the dispute is the opinion of Dr. Lilly, Pauley's family physician. Dr. Lilly began examining Pauley on February 11, 2005. During that initial examination, Dr. Lilly observed swelling in Pauley's hands and feet, and he diagnosed Pauley with rheumatoid and inflammatory arthritis. Dr. Lilly advised that Pauley stop working at his job with Bayer. In his claim for LTD benefits, Pauley listed Dr. Lilly as his only physician. (*See* A.R. 906.) On May 25, 2005, Dr. Lilly submitted an Attending Physician Statement on behalf of Pauley, which concluded that Pauley had a "total restriction" on his work ability and that his "condition appears to be chronic and possibly progressive." (*Id*. at 907-08.) In May 2006, Dr. Lilly opined that Pauley was not capable of sedentary-level work. (*Id*. at 817.)

On June 23, 2006, however, Dr. Lilly responded to a letter prepared by Julie Wigington, RN, a clinical case manager for Hartford (the "June Letter"). The June Letter explains that Hartford was "continuing the ongoing evaluation of [Pauley's] functional capabilities" and "attempting to move

forward with a Vocational Assessment that we might identify occupations for which Mr. Pauly [sic] may be qualified to perform." (A.R. 809.) The June Letter stated the following:

> [U]nless you provide restrictions or limitations otherwise, we will be readying a Vocational Assessment that we might identify full-time occupations for which Mr. Pauly [sic] may be qualified to perform by way of his education, training, and/or experience and; require no more than a sedentary-type functional capacity that is primarily seated with the option to sit/stand as needed with minimal lifting of no more than 10 pounds.

(*Id.* at 810.) In the June Letter, Nurse Wigington then asked Dr. Lilly, "Do you agree with the above assessment and limitations?" Dr. Lilly answered, "Yes." He also failed to provide specific restrictions or limitations in the space provided. (*Id.*)

Pauley argues that the June Letter "grew legs" for the purposes of Hartford's denial of his benefits. (Pl.'s Mem. Supp. Mot. Summ. J. 11.) Wigington mentioned it in her internal notes, claiming that "Dr. Lilly agreed w/ the limitations that the clmt was capable of performing full time wokr [sic] that requires more than sedentary type functional capacity as primarily seated w/ the option to sit/stand as needed w/ minimal lifting of no more than 10 lbs." (A.R. 127.) Pauley claims that the Vocational Assessment was then based on an "incorrect assessment" of Dr. Lilly's representations. (Pl.'s Mem. Supp. Mot. Summ. J. 11.) Hartford also relied upon the June Letter in its benefits denial letter, as did Drs. Borigini and Topper.

This, as well as alleged disregard for other medical evidence in the records, forms the basis of Pauley's challenge of Hartford's denial of LTD benefits.

## II. Standard of Review

It is the claimant's burden to demonstrate his entitlement to benefits under the Plan. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 603 (4th Cir. 1999). The "review of a plan administrator's benefits decision continues to follow a *de novo* standard unless the plan provides otherwise." *Gilbert v.*

*Medical Mutual of Ohio*, 666 F. Supp. 2d 625, 632 (S.D. W. Va. 2009). If a plan gives the administrator or fiduciary the power of discretionary review, an abuse-of-discretion standard applies. *See Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105; 128 S. Ct. 2343, 2348 (2008); *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 358 (4th Cir. 2008). The parties do not dispute that the standard of review here is abuse of discretion, because the Plan gives the administrator and fiduciaries "discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy." (A.R. 35-36.)

Under this standard, a benefits decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion. *See Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004). A decision "is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks omitted). In addition, "remand is not a common outcome in the claim-denial review setting," *Gilbert*, 666 F. Supp. 2d at 634, but it can play an important role: "If the court believes the administrator lacked adequate evidence on which to base a decision, the proper course is to remand to the trustees for a new determination, not to bring additional evidence before the district court." *Elliott*, 190 F.3d at 609 (internal quotation marks omitted).

### III. Discussion

Beyond the applicable standard of review considerations, *Booth* provides guidance on how to inquire into the reasonableness of an administrator's decision. In that decision, the court of appeals assembled a multi-factor test, including consideration of the following:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they

> support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342-43 (4th Cir. 2000). Although I have considered each of the eight *Booth* factors, the third and fifth factors are the subject of most controversy between the parties. Those factors are considered below.

>    A.   *The materials considered were inadequate, and the decision-making process was not reasoned or principled.*

>       1.   *The June Letter and other medical evidence*

First, Pauley argues that the June Letter signed by Dr. Lilly was given inappropriate weight in the decision-making process, and Hartford's reliance on it was unreasonable. He argues that "[n]owhere in this letter does it even ask in a straight forward manner whether Dr. Lilly believes the plaintiff could work at a sedentary job." (Pl.'s Mem. Supp. Mot. Summ. J. 16.)

The court agrees that the June Letter is awkwardly worded and could be easily misunderstood. It does not ask Dr. Lilly directly whether Pauley could perform sedentary work. And there were other, more reliable documents in the record from Dr. Lilly showing that he believed that Pauley had a degenerative disease that rendered him unable to work in any capacity. For example, one month prior to the June Letter, Dr. Lilly indicated that Pauley could *not* perform "Sedentary Level Work full time which is sitting most of the time with flexibility to change position as needed, and occasionally lifting 0-10 lbs." (A.R. 817.) In addition, in November 2007, Dr. Lilly submitted a letter stating that Pauley "is disabled from gainful employment." (*Id.* at 480.)

-8-

In light of the ambiguity exhibited by the June Letter, the degree to which Hartford relied upon it is much too great.  The letter is mentioned in Hartford's internal notes, Dr. Borigini's and Dr. Topper's reports, and the final denial letter to Pauley.  In fact, after receiving Dr. Lilly's response to the June Letter, Hartford made no further in-depth requests about Pauley's functional limitations.     Along these lines, it is equally troubling that the record lacks medical evidence in close temporal proximity to the denial of LTD benefits.  The district court for the Southern District of New York has faced a similar issue.  In *Zurndorfer v. Unum Life Ins. Co. of Am.*, Unum terminated the plaintiff's LTD benefits in May 2003, but it "did not rest its decision on a contemporaneous medical examination or other evidence that [the plaintiff] was then able to perform her occupation."  543 F. Supp. 2d 242, 260 (S.D.N.Y. 2008).  In *Zurndorfer*, the insurance company "repeatedly" relied on a report from the plaintiff's oncologist, which was prepared seven months before denial of LTD benefits, as evidence that the plaintiff was not disabled.  *Id*. at 261.  The court concluded that "it was [not] reasonable for Unum to rely so heavily on [the oncologist's] opinion that [the plaintiff's] condition was stable while undergoing chemotherapy up until October 2002 in determining plaintiff's level of disability in May 2003."  *Id*.  The court continued, "Unum was obligated to examine her disabilities then, and not rely on a stale report" and entered summary judgment in favor of the plaintiff.  *Id*.  *See also Vick v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 868, 877 (E.D. Mich. 2006) (observing that the "critical time period" for claims review is that time "leading up to Defendant's denial").

Similarly, in this case, Hartford relied primarily on evidence collected from January 15, 2004, to June 23, 2006.  (*See* A.R. 435-36.)  The latest report relied upon by Hartford in its initial denial is from July 2007, but it only pertains to Pauley's sleeping problems.  (*See id.* at 568.)

Otherwise, Hartford considered Dr. Swisher's report and statement from May 30 and June 4, 2007, stating that MRI results showed "degenerative disease" and her "[f]indings [were] consistent with a sever[e] axonal polyneuropathy." (*Id*. at 498-99.)

The dearth of evidence collected by Hartford up to, and even after, the denial of LTD benefits is especially significant, given that Pauley has a degenerative disease. A degenerative disease is one classified by "deterioration of a tissue or an organ in which its vitality is diminished or its structure impaired." (Medline Plus Medical Dictionary, www.merriam-webster.com/medlineplus/degeneration.) Pauley's condition is likely to get worse over time. In addition, Drs. Borgini and Topper were asked to "provide your opinion of [Pauley's] work capacity as of 8/10/2007 . . . and *from that date to present if the condition has changed significantly*." (A.R. 757, 760 (emphasis added).) Hartford's reliance on evidence of functional limitation collected before the June Letter – and lack of evidence collected afterwards – is unreasonable.

### 2. *The independent physicians' reports*

Furthermore, the independent review process undertaken by Drs. Borigini and Topper in April 2008 deserves a closer look. Dr. Borigini, an internal medicine and rheumatology doctor, reviewed and summarized Pauley's medical records and physician letters as follows:

> The rheumatology evaluation does not note compromise in joint function; the claimant could lift 20 pounds occasionally and 10 pounds frequently; he is able to stand, walk or sit for 6 hours out of an 8 hour day. He is able to do fine and gross manipulation with his hands. The submitted records do not support a clinically objective inability to function.

(A.R. 757.) Dr. Borigini attempted to contact Dr. Lilly, who did not return his phone calls, and Dr. Soulsby, who, Hartford claims, would not speak to Dr. Borigini without payment.

Dr. Topper, a neurologist, spoke with Dr. Lilly on March 21, 2008. He reported that Dr. Lilly told him that "the claimant does not have rheumatoid arthritis, but rather has severe degenerative joint disease." (*Id.* at 758.) Dr. Topper attempted to contact Dr. Soulsby and Dr. Swisher, neither of whom returned his calls. He reviewed the doctors' reports and concluded that

> the claimant's leg pain caused by axonal neuropathy is expected to be triggered by walking and standing, not by sitting. The claimant does not have any other neurological impairments, such a weakness, incoordination, cognitive, visual or auditory changes. Therefore, based on a reasonable degree of medical certainty, from the neurological point of view, the claimant has preserved functionality to perform sedentary work, without any additional restrictions or limitations.

(*Id.* at 760.)

Pauley argues that opinions from his numerous treating physicians contradict the opinions of Drs. Borigini and Topper. Specifically, Dr. Lilly's and Dr. Swisher's letters of November 2007 and January 2008, respectively, claim that Pauley has a chronic condition that would not improve and that leaves him incapable of working in any capacity.

ERISA does not require fiduciaries to give special deference to treating physicians' opinions. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831-34 (2003). And it is not an abuse of discretion for a fiduciary to deny benefits when conflicting medical reports are presented. *Elliott*, 190 F.3d at 606. But the fiduciary "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834.

The record shows, however, that Drs. Borigini and Topper did not obtain or rely upon proper evidence in making their determination and did not sufficiently disclaim Pauley's treating physicians. First, they discredited some of the most recent medical evidence from Pauley's treating physicians without sufficient explanation. Both Dr. Swisher and Dr. Lilly submitted opinions that

-11-

Pauley was unable to work, and these opinions were rendered closer to the time of LTD benefits denial than the June Letter or other reports relied upon by the doctors.

Notably, neither doctor explains why Dr. Lilly's analysis is incorrect. Dr. Topper does not challenge Dr. Lilly's November 2007 letter at all, and Dr. Borigini simply states that "[t]he submitted documentation does not support clinical objective information which would allow me to conclude that the claimant is unable to push, pull, or drive." (*Id.* at 757.) But Dr. Borigini was referring to a report from Dr. Lilly that was rendered in December 2005, which stated that Pauley could not "push[]/pull[], lift[], work[] overhead, or driv[e]." (*Id.*) For one thing, Dr. Borigini says nothing about Pauley's ability to lift, which is one of the requirements of sedentary work. Furthermore, Dr. Borigini does not address or specifically discount Dr. Lilly's November 2007 letter, which states that he suffers from a "severe" degenerative joint disease. (*See id.* at 480.) Both doctors mention the June Letter, however, as if that document can neutralize every other report submitted by Dr. Lilly. *Cf. Kirsch v. Jefferson Pilot Fin. Ins. Co.*, 2008 U.S. Dist. LEXIS 47051, *18 (E.D. Wis. June 17, 2008) (upholding denial of benefits where administrator denied claimant's benefits because "the medical documentation [did] not support restrictions or limitations.").

Second, Drs. Borigini and Topper failed to speak directly with Pauley's treating physicians, even though they were asked to do so by Hartford. (*See* A.R. 757 (For Dr. Borigini: "Please review all the medical information, contact Dr. Lilly and Dr. Soulsby to clarify Mr. Pauley's medical situation and functionality, then provide your opinion . . . "); 760 (For Dr. Topper: "Please review all the medical information, contact Dr. Swisher to clarify Mr. Pauley's medical situation and functionality, then provide your opinion . . .").) Neither doctor consulted with Dr. Swisher or Dr. Soulsby, and only Dr. Topper spoke with Dr. Lilly, who told him that Pauley had a degenerative

joint disease. Drs. Swisher and Soulsby should have been consulted, especially because their opinions were so crucial to the assessment of Pauley's LTD benefits, and because Drs. Borigini and Topper were asked to talk with the treating physicians before completing their reports.[4]

### 3. *The Social Security award*

Pauley also argues that "if the defendant was acting in a reasonable and fiduciary capacity, it would of [sic] at least tried to reconcile . . . the plaintiff's receipt of Social Security benefits awarded the same month." (Pl.'s Reply to Def.'s Resp. Mot. Summ. J. 5.) Administrators have "no obligation to weigh the [SSA]'s disability determination more favorably than other evidence." *Elliott*, 190 F.3d at 607-08. Such determination should at least be addressed or considered, however, especially when an administrator receives reimbursement because of an SSA finding of disability. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294-95 (6th Cir. 2005) ("[A] decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation." (internal quotation marks omitted)). *See also Crouch v. Siemens Short-Term Disability Plan*, 662 F. Supp. 2d 553, 561 (S.D. W. Va. 2009) (remanding to plan administrator where administrator "did not review the SSA's award of benefits – an award which has at least some evidentiary significance even in the absence of substantive medical findings by the SSA"); *Thomas v. ALCOA Inc.*, No. RDB-07-1670, 2008 WL 4164156, *13 (D. Md. Sept. 5, 2008) ("While Alcoa is not bound by the Administrative Law Judge . . . , its findings should have been weighed by the company as relevant evidence."); *Hines v. Unum*

---

[4] Pauley argues that Dr. Topper was told to make a written request to speak with Dr. Soulsby, which he failed to do. Hartford claims that Dr. Soulsby refused to speak with Drs. Topper and Borigini unless they paid him. With regard to Dr. Swisher, Dr. Topper's report shows that he called Dr. Swisher three times, during three consecutive days, but he did not try to call her again in the next two weeks before the report was submitted.

*Life Ins. Co. of Am.*, 110 F. Supp. 2d 458, 468 (W.D. Va. 2000) ("While Unum is not bound in any way by the determinations of the ALJ, it should have at least considered those findings as relevant evidence.").

Hartford's internal notes show that Pauley notified Hartford of his award of Social Security benefits, and a result, Hartford conducted a "recalculation of [own occupation] benefits" awarded from August 10, 2005, to June 30, 2006. (A.R. 69.) Hartford determined that Pauley owed Hartford $11,210.60 for overpayment. (*Id.* at 69, 351-52.) Despite this reimbursement to Hartford, there is no indication that Hartford even considered the reasoning behind the SSA's disability determination.

    *B.      This matter should be remanded.*

Hartford's analysis was based on stale medical evidence and overemphasized the June Letter. Hartford's independent physicians discredited Pauley's treating physician reports without contacting the physicians or providing ample explanation. Hartford lacked adequate evidence and improperly relied upon inadequate or unreliable evidence. This led to unreasonable decision-making. In this situation, the proper course of action is to remand to the administrator. *See Crouch*, 662 F. Supp. 2d at 561-62 (concluding that failures in administrator's analysis and deficiencies in independent review "necessitat[ed] reconsideration of the plaintiff's claim"). Upon remand, Hartford should collect updated, in-depth evidence of Pauley's alleged functional limitations; consider the Social Security Administration's award of benefits; and consult with his treating physicians before rendering a decision.

**IV.    Conclusion**

The plaintiff's motion to exceed page limit [Docket 14] is **GRANTED**, but his motion for summary judgment [Docket 16] is **DENIED**. The defendant's motion for summary judgment

[Docket 12] is **DENIED**. This matter is **REMANDED** for a more thorough analysis based on adequate evidence. The court **DIRECTS** the Clerk to send a copy of this written opinion and order to counsel of record and any unrepresented party.

                                        ENTER:        July 20, 2010

                                        Joseph R. Goodwin, Chief Judge